# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5550 | **DATE** | 7/17/2000 |
| **CASE TITLE** | Barry Stewart vs. Harrah's Illinois Corp., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/14/2000 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order.  Both the Harrah's Defendants' and the Joliet Defendants' motions to strike (Docs. 99-1 and 103-1) are granted in part and denied in part, as discussed *supra*.  The Joliet Defendants' motion for summary judgment (Doc. 72-1) is granted with respect to Counts II and VI, but denied with respect to Counts I and VII.  The Harrah's Defendants' motion for summary judgment (78-1) is granted with respect to Counts I, II, III, IV and V and denied with respect to Count VII.  The parties are directed to complete discovery on those outstanding Counts (VIII-XI) within 60 days.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 4 number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 1 8 2000 date docketed | 114 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 7/17/2000 date mailed notice | |
| ETV | courtroom deputy's initials | 00 JUL 17 PM 3:01 Date/time received in central Clerk's Office | ETV mailing deputy initials |

| | | |
|---|---|---|
| BARRY STEWART, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98 C 5550 |
| | ) | |
| HARRAH'S ILLINOIS CORPORATION, | ) | Judge Rebecca R. Pallmeyer |
| DAVID H. BRAGDON, individually, and | ) | |
| as agent of HARRAH'S ILLINOIS | ) | |
| CORPORATION, CHARLES ANDREWS, | ) | |
| individually, and as agent of HARRAH'S | ) | |
| ILLINOIS CORPORATION, and TERRY | ) | **DOCKETED** |
| BULLINER, individually, and as agent of | ) | |
| HARRAH'S ILLINOIS CORPORATION, | ) | JUL 1 8 2000 |
| CITY OF JOLIET, a municipal Corporation, | ) | |
| BRUCE E. LARSON, individually and in his | ) | |
| capacity of Police Officer of the CITY OF | ) | |
| JOLIET, and as agent of HARRAH'S | ) | |
| ILLINOIS CORPORATION, JOSEPH | ) | |
| BEAZLEY, individually and in his | ) | |
| official capacity as Chief of Police of the | ) | |
| CITY OF JOLIET, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In January 1998, Plaintiff Barry Stewart ("Stewart"), an African-American male, was arrested in a Joliet casino and charged with disorderly conduct, resisting arrest and aggravated battery of a police officer. Stewart filed this eleven-count civil rights and common law action against a host of Defendants. Those named include: Harrah's Illinois Corporation ("Harrah's"); David Bragdon ("Bragdon"), Charles Andrews ("Andrews"), and Terry Bulliner ("Bulliner"), security personnel at Harrah's (collectively "the Harrah's Defendants"); the City

114

of Joliet, Illinois; Bruce Larson ("Larson"), a Joliet police officer; and Joseph Beazley ("Beazley"), Joliet's Chief of Police (collectively "the Joliet Defendants"). As set forth more fully below, Plaintiff alleged that certain Defendants violated his civil rights, or conspired to do so, as prohibited by 42 U.S.C. §§ 1981, 1983, and 1986, by improperly using excessive force during his arrest, falsely arresting him, and maliciously prosecuting him. Plaintiff also advances an action for common law battery against Larson, Andrews, and Bulliner and seeks to hold Harrah's responsible for negligent hiring of Andrews and Bulliner, and for wilful or wanton misconduct. Finally, Plaintiff brings *Monell* actions against both the City of Joliet and Beazley for failure to train and failure to discipline Larson. Both the Harrah's Defendants and the Joliet Defendants have moved for summary judgment on Counts I through VII. For the reasons set forth below, the motions are granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56.1(a)(3) and (b)(3) Statements of Material Facts.[1] As filed, these Statements suggest the existence of a number of material factual disputes. The court notes, however, that Plaintiff's Statements of Facts filed in opposition to both motions for summary judgment contain numerous unsupported

---

[1]    For ease of reference, the court will refer to each parties' Rule 56.1 Statements of Facts in the following manner:
(1)    Joliet Defs.' Statement of Facts
(2)    Harrah's Defs.' Statement of Facts
(3)    Pl.'s Response to Joliet Defs.' Statement of Facts
(4)    Pl.'s Response to Harrah's Defs.' Statement of Facts

allegations or denials.[2] Accordingly, both the Joliet and the Harrah's Defendants have moved to strike portions of Plaintiff's 56.1(b)(3) Statement. Nevertheless, this court will use its discretion to consider evidence where it has found support for Plaintiff's statements upon an independent review of the record. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). To the extent that the court was not able to find such support, those statements will be stricken and pursuant to Local Rule 56.1, the court will deem admitted the corresponding statements of the movants' Statement of Facts.

## A.    Facts Leading Up to Stewart's Arrest

Stewart is an African-American male who visited Harrah's river boat casino in Joliet, Illinois on the night of January 17, 1998. (Joliet Defs.' Statement of Facts ¶¶ 1, 11; Pl.'s Response to Joliet Defs.' Statement of Facts ¶¶ 1, 10; Harrah's Defs.' Statement of Facts ¶ 1; Pl.'s Response to Harrah's Defs.' Statement of Facts ¶ 1.) Prior to arriving at the casino, at approximately 7:30 p.m. on the night of January 17, 1998, Stewart borrowed his mother's car and visited a friend, Robin Massie. Massie testified that while at her apartment, Stewart drank one or two beers. (Massie Dep., at 14.) Stewart denies drinking alcohol before arriving

---

[2]    Plaintiff's lack of diligence in preparing the Rule 56.1 Statement is most disappointing. Not only has Plaintiff's counsel failed to provide the necessary references required by the Rule, but Plaintiff's counsel has also used little apparent care in preparing the supporting exhibits. For example, Plaintiff's counsel attributed the same pages of deposition testimony to two distinct deponents; submitted copies of deposition testimony, including that of Stewart, which contain duplicate, non-consecutive, and/or missing pages. Perhaps most egregious, Plaintiff's counsel fails to provide the court with page 245 of Stewart's deposition which is cited by Plaintiff as supporting Plaintiff's denial of kicking any of the persons involved in his arrest.

at Harrah's. (Stewart Dep., at 95-97.)

Upon arriving at Harrah's, Stewart left his car with the valet and received a claim ticket. (Stewart Dep., at 82.) Stewart drank a beer while waiting with Massie in the pavilion area prior to boarding the river boat. (Stewart Dep., at 76; Massie Dep., at 17, 62.) After boarding the river boat, the two friends parted company. (Stewart Dep., at 77; Massie Dep., at 17.) Stewart began gambling and drank another beer, or a portion thereof. (Stewart Dep., at 77, 95.) Stewart then offered to buy a drink for a female casino patron. (*Id.* at 79.) Before the woman could respond, a Harrah's security officer approached and asked the woman if Stewart was "bugging her," to which she replied "yes." (*Id.* at 79 - 80.) Stewart responded, "Ain't this some shit," then walked off of the boat. (*Id.* at 80.) On the way out, Stewart stopped to get another beer. (*Id.* at 95, "I had one right as I was going out the door.")

On the night in question, Detective Larson of the Joliet Police Department ("JPD") was working at Harrah's on an off-duty security assignment, called a "special assignment." (Harrah's Defs.' Statement of Fact ¶ 4, Larson Dep., at 50.) His duties included patrolling the pavilion and valet parking areas, providing police presence, and keeping the peace. (Larson Dep., at 49, 55.) Although this was an off-duty security assignment, Larson wore the official uniform, badge, and hat of the JPD (Stewart Dep., at 100), and was assigned a JPD squad car. (Larson Dep., at 60.)

### B.   Stewart's Arrest

Before he was arrested, Stewart approached the coat check and car valet area to retrieve his coat, but denies that he asked that his car be retrieved. (Pl.'s Response to Joliet Defs.'

Statement of Facts ¶ 14; Stewart Dep., at 84, 87, 227.) The parties disagree as to what happened next. Christopher Goulding, the valet attendant, testified that Stewart demanded his keys and his car in a very "profane manner." (Goulding Dep., at 10.) Stewart denies asking for his keys and instead asserts that he attempted to retrieve his coat. (Stewart Dep., at 84, 221, 227.) Stewart testified that at first, he politely asked "please may I have my coat." (Stewart Dep., at 87, 221.) Stewart also testified, however, that after making three requests for his coat and presenting his stub he asked, "why in the fuck I can't get my coat?" (Stewart Dep., at 88.) Indeed, Stewart admits that after Goulding refused his request he "was talking a little loud." (Stewart Dep., at 90.)

Concerned about Stewart's behavior, Goulding asked Stewart to calm down, called John Stancato, Harrah's guest services supervisor, and notified security surveillance of a possible problem in the coat check and car valet area. (Harrah's Defs.' Statement of Facts ¶ 14; Goulding Dep., at 11,13.) Stancato approached Stewart, whom he believed to be intoxicated, and whom he observed to be loud and agitated. (Joliet Defs.' Statement of Facts ¶ 17.) Stancato refused to return Stewart's keys or coat and instead offered either to "comp" a taxi or to get Stewart some coffee and food. (Stancato Dep., at 13.) Stewart then began shouting obscenities and threatening him.[3] (*Id.* at 13-14.)

---

[3] At one point in his deposition testimony, Stewart denies threatening any Harrah's personnel. (Stewart Dep., at 94.) Later in his testimony, however, in response to questions about whether he yelled obscenities or threatened Harrah's employees, Stewart answered, "I could have." (*Id.* at 227.) Still later, Stewart testified that he didn't directly threaten Harrah's personnel, and that he didn't recall making indirect threats towards
(continued...)

Stancato radioed Harrah's customer safety staff for assistance, and Andrews, Bragdon, Bulliner, and Larson responded. (Joliet Defs.' Statement of Facts ¶ 18-19.) Upon arriving at the scene, several security officers observed that Stewart was intoxicated, shouting profanities, and holding a beer bottle. (*Id.* at ¶ 20.) Stewart denies being intoxicated and denies that he was holding a beer bottle, (Stewart Dep., at 94-97,) but several witnesses testified that Stewart smelled strongly of alcohol, had bloodshot eyes, slurred his speech, and was unable to stand steadily. (Bragdon Dep., at 67-68; Andrews Dep., at 54-55; Stancato Dep., at 22; *but see* Bulliner Dep., at 45 ("At that point, no. I wasn't sure [if Stewart was intoxicated]. I didn't form, you know, an opinion at that time, no.").)

Andrews, one of the first security officers to arrive, notified Harrah's surveillance of the situation and asked Stewart to calm down and lower his voice. (Joliet Defs.' Statement of Facts ¶ 21; Stewart Dep., at 229-30.) Upon arriving at the scene, Bragdon also requested that Harrah's surveillance record the incident, identified himself to Stewart as a supervisor, and attempted to calm Stewart down. (Joliet Defs.' Statement of Facts ¶ 22-23.) Bragdon further asserts that Stewart did not calm down, but instead began threatening him and shifted the grip on his beer bottle from the base to the neck. (*Id.* ¶ 27.) Plaintiff maintains that he did calm down and lower his voice, that he was not holding a beer bottle, and that he only

---

[3](...continued)
Harrah's personnel. (*Id.* at 228-29.) These contradictory denials are inadequate responses to Defendants' statement of fact. The court therefore deems as admitted Defendants' assertions that Stewart threatened Harrah's personnel for not returning his personal belongings.

shouted obscenities when he was provoked by Officer Larson, who remained on the scene. (Stewart Dep., at 94, 230-31.) Plaintiff does admit, however, that he recognized that Larson was a Joliet police officer and that he threatened to "kick [Larson's] ass." (Stewart Dep., at 99-100.)

Bragdon then advised Larson that he would sign a complaint for disorderly conduct against Stewart. (Joliet Defs.' Statement of Fact ¶ 31.) Larson placed Stewart under arrest and Andrews and Bulliner handcuffed Stewart's hands behind his back. (*Id.*) Andrews testified that Stewart mildly resisted the attempt to handcuff him by tightening his arm muscles. (Harrah's Defs.' Statement of Facts ¶ 41.) Stewart denies making any attempt to resist arrest, and instead testified that he "put my hands behind my back and I did exactly as he instructed me to do." (Pl.'s Response to Harrah's Defs.' Statement of Facts ¶ 40; Stewart Dep., at 147, 149, 236.) Surveillance began taping the incident shortly before Andrews and Bulliner handcuffed Stewart. (Surveillance Video.)[4]

## C.    Post-Arrest Processing

Once he had been handcuffed, Larson, Andrews, and Bulliner took Stewart to the dispatch room at Harrah's to photograph him and book him for disorderly conduct. (Joliet Defs.' Statement of Facts ¶ 33.) On the way to the elevator, and in the elevator, Defendants maintain that Stewart continued to shout threats and profanity at the officers. (Joliet Defs.'

---

[4]    Accompanying their motion for summary judgment, the Joliet Defendants submitted a copy of the surveillance video tape recording the events outlined here, beginning shortly before the security guards handcuffed him, and ending with Stewart leaving the casino in a JPD squad car. The video is unaccompanied by an audio recording.

Statement of Facts ¶¶ 35-36; Harrah's Defs.' Statement of Facts ¶ 46.) Stewart asserts instead that on the way to the elevator, he was asking "why come I'm in handcuffs," and "why come you taking me to the security room." (Stewart Dep., at 103.) The surveillance video shows Stewart mouthing something at the officers while being led to the dispatch room. The Harrah's Defendants also maintain that Stewart attempted to pull away from the Harrah's officers on the way to the elevator, an assertion that Stewart denies. (Harrah's Defs.' Statement of Fact ¶¶ 46-47; Pl.'s Response to Harrah's Defs.' Statement of Facts ¶ 47.) The video does not clearly show Larson pulling away from the guards. In the elevator, Plaintiff admits that he and Larson were yelling obscenities at each other and that he told Larson he was going "to kick his fucking ass." (Stewart Dep., at 238.)

Both sets of Defendants assert that Stewart became more agitated, belligerent and uncooperative as the officers and Stewart entered the dispatch room. (Joliet Defs.' Statement of Facts ¶ 41; Harrah's Defs.' Statement of Facts ¶ 53.) Larson claims that he directed Plaintiff to sit on a stool in the dispatch room, but Plaintiff refused. (Joliet Defs.' Statement of Facts ¶ 41.) Plaintiff claims that he did comply with Larson's requests to sit down, although he also acknowledges that he later stood up again. (Pl.'s Response to Joliet Defs.' Statement of Facts ¶ 41; Stewart Dep., at 150.) The video tape shows, however, that Plaintiff did not sit on the stool until after the takedown.

Larson testified that Stewart moved in closer to him and, while yelling, sprayed spittle into Larson's face. (Joliet Defs.' Statement of Facts ¶ 41.) Plaintiff denies spitting on Larson and claims that he threatened to "kick [Larson's] ass" only after Larson threatened him. (Pl.'s

Response to Joliet Defs.' Statement of Facts ¶ 40.) At some point inside the dispatch room, Larson asserts that Stewart started to lunge at him with his upper body. (Joliet Defs.' Statement of Facts ¶ 45.) Although the video tape does not clearly show movement by Stewart towards Larson, neither does Stewart adequately deny that he moved towards Larson. Instead, Stewart denies that he kicked, kneed, head-butted, bit, rammed,[5] stomped or spit on Larson, or that he made any physical contact with Larson before the takedown. (Pl.'s Response to Joliet Defs.' Statement of Facts ¶ 42.) Without denying that he moved toward Larson, he instead merely states that there was no room to charge at Larson. (Stewart Dep., at 115-16.) As such, the court deems admitted the fact that Stewart made some movement towards Larson with his upper body or his head.

Perceiving an immediate physical threat, Larson seized Stewart's arm, spun him off balance and took him down to the floor. (Joliet Defs.' Statements of Facts ¶ 42.) Larson claims he put one hand behind Stewart's head to protect it. (*Id.*) Stewart denies that Larson attempted to protect his head, claiming that Larson did not catch him as he fell to the floor. (Stewart Dep., at 241.) Indeed, Plaintiff claims instead that Larson punched him in the chest and that the punch knocked him to the ground. (Pl.'s Response to Harrah's Statement of Facts ¶ 58.) The video tape appears to show that while using his left hand to spin Stewart off balance, Larson also used his right hand in some fashion during the takedown. Plaintiff's head

---

[5]     Larson never claimed that Stewart kneed, head-butted, bit, rammed, or stomped on him. Indeed, Larson himself testified that Stewart did not make physical contact with him before the takedown. (Larson Dep., at 91.)

struck a chair in the dispatch room on his way down to the floor. (Larson Dep., at 100.)

Andrews testified that just prior to the take down, he saw Stewart move his feet as if about

to kick Larson or step on his foot, and that he believed that Stewart did step on Larson's right

foot. (Harrah's Defs.' Statement of Facts ¶ 61.) Plaintiff denies stepping on Larson's foot,

or making any physical contact with Larson before the takedown. (Pl.'s Response to

Harrah's Defs.' Statement of Facts ¶ 61.) As noted, Larson also testified that Stewart did not

actually physically contact him before the takedown. (Larson Dep., at 91.)

Once on the floor, Larson claims that he placed his foot on Stewart's upper torso to

hold him in place. (Joliet Defs.' Statement of Facts ¶ 47.) Stewart contends instead that

Larson "stomped" on the upper part of his back. (Pl.'s Response to Joliet Defs.' Statement

of Facts ¶ 47.) In spite of being held on the ground, Stewart continued threatening the

officers.[6] (Joliet Defs.' Statement of Facts ¶ 47.) Larson next contends that he put on his

gloves to protect himself against razor blades, syringes, or other sharp objects, and slid

Stewart forward in order to search him for identification and weapons.[7] (Joliet Defs.'

Statement of Facts ¶ 48, 50.) Plaintiff asserts that Larson put on his gloves after saying "nigger

I don't want to put my hands on you." (Pl.'s Response to Joliet Defs.' Statement of Facts

¶ 48.) The Joliet Defendants deny that Larson ever made such a comment. (Joliet Defs.'

Statement of Facts ¶ 47.) Defendants allege that at this time, Stewart began kicking at Larson,

---

[6]     Stewart denies this allegation, but again fails to support this denial with
reference to the record. (Pl.'s Response to Joliet Defs.' Statement of Facts ¶ 47.)

[7]     From the video, it appears that Larson both slid Stewart forward and turned
him over so that he was face down on the floor.

Andrews and Bulliner, striking Larson in the ankle and Andrews and Bulliner in the shins and feet. (Joliet Defs.' Statement of Facts ¶ 51; Harrah's Defs.' Statement of Facts ¶ 65.) After Stewart began kicking, Larson put his foot back on Stewart's torso and Andrews and Bulliner pinned Stewart's legs with their feet. (Joliet Defs.' Statement of Facts ¶ 52; Harrah's Defs.' Statement of Facts ¶ 66.) Stewart admits to "wiggling" under the pressure of Larson's foot, but denies kicking anyone, contending that Andrews and Bulliner pinned his legs the entire time he was on the floor. (Stewart Dep., at 150, 243-45 ("[My legs] wasn't moving because they was holding them.").)[8] Because of the position of a counter in the dispatch room, the surveillance tape provides only an obstructed view of these events, and does not reveal Stewart's leg movements, if any.

Larson then searched Stewart's body and his wallet, assisted him up from the floor, and directed him to the stool. (Joliet Defs.' Statement of Facts ¶ 53-54.) Although Plaintiff sat down at this time, he repeatedly attempted to get up off the stool. (Joliet Defs.' Statement of Facts ¶ 55; Stewart Dep., at 150 ("Q: And did you continue to stand up? A: Yeah, but I applied every time he asked me to sit down. I applied to it. Q: But after you sat down, you would get back up again? A: Exactly.").) The parties dispute whether Stewart continued to make threats and yell profanities at the officers. (Joliet Defs.' Statement of Facts ¶ 55; Pl.'s

---

[8] Despite citing to page 245 of his deposition testimony in support of his assertion that he didn't kick anyone, Plaintiff failed to include this critical page with his exhibits. Because the last question asked of Plaintiff on the bottom of page 244 is "I'm asking you if you were kicking your legs . . .," the court assumes that Plaintiff responded in the negative.

Response to Joliet Defs.' Statement of Facts ¶ 55.) Stewart was then transported to the police station for processing. (Pl.'s Response to Joliet Defs.' Statement of Facts ¶ 56.)

### D. The Booking, Indictment and Dismissal

At the JPD, Stewart was booked and charged with disorderly conduct, resisting arrest, and upon approval from the State's Attorney's office, he was also charged with aggravated battery of a police officer. (Joliet Defs.' Statement of Facts ¶ 57.) Stewart was held overnight without bond on the aggravated battery charge, but released on his own recognizance the next afternoon. (Stewart Dep., at 191.) On January 28, 1998, the grand jury issued an indictment charging Stewart with aggravated battery. (Bill of Indictment, Ex. 19 to Joliet Defs.' Statement of Facts ¶ 58.) On June 30, 1998, Assistant State's Attorney Mary Fillipitch recommended *nolle prosequi* of Stewart's case, citing as her reason that "[t]he incident was videotaped at Harrah's and the tape does not show the kick the officer complained of (although a counter blocks the view). The Officer appears to be dealing very aggressively with the Def." (Disposition Form, Ex. 20 to Joliet Defs.' Statement of Facts ¶ 60.) At no time during or following his arrest did Stewart complain of injuries or request medical or psychiatric assistance. (Pl.'s Response to Joliet Defs.' Statement of Facts ¶¶ 62-64.)

### E. The Civil Rights Action

Based on the events surrounding his arrest on January 17, 1998, Stewart brought this eleven-count complaint. In Count I, Stewart alleges that Defendants Larson and Harrah's used force against him beyond the time of his arrest and without legal provocation and therefore violated his civil rights pursuant to 42 U.S.C. § 1983. Count II alleges that Larson

and Harrah's further violated Stewart's civil rights under 42 U.S.C. § 1983 by falsely arresting and charging him with aggravated battery of a police officer and also causing the malicious prosecution of this false charge against him. Count III further alleges that Harrah's, Larson, Bragdon, Andrews, and Bulliner engaged in a conspiracy to use excessive force and to secure an illegal arrest with the knowledge and purpose to deprive Stewart of his civil rights in violation of 42 U.S.C. § 1983. In Count IV, Stewart alleges that Bragdon, Andrews, and Bulliner violated their statutory duty under 42 U.S.C. § 1986 by failing to prevent the wrongs committed against Stewart by Larson. Count V realleges a Section 1983 malicious prosecution claim against Harrah's, Bragdon, and Bulliner for filing false reports corroborating the aggravated battery of a police officer charge. In Count VI, Stewart charges Larson with racial discrimination as prohibited under 42 U.S.C. § 1981. Count VII alleges common law battery claims against Larson, Andrews, and Bulliner. Counts VIII and IX allege common law negligence and wilful and wanton misconduct against Harrah's for failure to properly hire, train, supervise security personnel. Finally, Counts X and XI allege Section 1983 claims against the City of Joliet and its Chief of Police, Joseph Beazley, for promoting a custom or policy of failing to properly train, supervise, and discipline its officers.[9] Both the Joliet Defendants and the Harrah's Defendants have moved for summary judgment on all counts. For the reasons set forth below, both motions are granted in part and denied in part.

---

[9]     Pursuant to agreements between the respective parties, the court bifurcated consideration of Counts VIII through XI pending resolution of the present motions for summary judgment.

## DISCUSSION

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir.1998) (citing FED. R. CIV. P. 56(c)), *cert. denied*, 525 U.S. 929 (1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *See Thomas & Betts Corp.*, 138 F.3d at 291. "Only disputes that could affect the outcome of the suit under governing law will preclude an entry of judgment for the moving party." *Id.* In ruling on a motion for summary judgment, the court cannot weigh the affidavits or the credibility of the parties. *See Castillo v. United States*, 34 F.3d 443, 445 (7th Cir. 1994). Nevertheless, contradictory and unsupported assertions of fact are insufficient to defeat summary judgment. *See, e.g., Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1152 n. 1 (7th Cir. 1997); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 861 (7th Cir.1985); *Eckert v. Kemper Fin. Servs., Inc.*, No. 95 C 6831, 1998 WL 699656,*5 (N.D. Ill. September 30, 1998). Against this standard, the court addresses each Defendants' arguments in turn.

### B. Count I: Excessive Force

#### 1. Against Larson

Stewart alleges that he was subjected to the use of excessive force by Larson in

violation of 42 U.S.C. § 1983. Indeed, in his response brief to the Joliet Defendants' motion for summary judgment, Stewart asserts that Larson beat him "like a slave," hit him "with a closed fist," attempted to "smash his head into a hard counter," and used "'whip-saw' force" to "inflict punishment" that "easily could have killed" him. (Pl.'s Response Br. at 14-15.) The Joliet Defendants, on the other hand, contend that Larson reasonably concluded that Stewart posed an immediate threat to Larson and others, and that the takedown was an appropriate and proportional response to the perceived harm. (Joliet Defs.' Br., at 13.) Further, the Joliet Defendants argue, the surveillance tape unambiguously and conclusively establishes that Larson did not use excessive force against Stewart. (*Id.*)

The Supreme Court has held that Section 1983 excessive force claims arising in the context of an arrest or investigatory stop of an otherwise free citizen should be analyzed under the reasonableness standard of the Fourth Amendment.[10] *See Graham v. Connor*, 490 U.S. 386, 395 (1989). Under this objective standard, the "particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396. The inquiry is fact intensive, requiring courts to carefully analyze the particular facts and the totality of the circumstances confronting the officers, "including the severity of the crime at issue, whether the suspect pose[d] an immediate threat

---

[10]    To recover under Section 1983, Stewart must establish that he was deprived of a federal right by an individual acting under "color of state law." *See Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1985). The parties here do not dispute that Larson, wearing his Joliet Police Department uniform and badge, acted under color of state law in effecting the arrest.

to the safety of the officers or others, and whether [the arrestee was] actively resisting arrest or attempting to evade arrest by flight." *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997), *cert. denied*, 522 U.S. 1116 (1998) (quoting *Graham*, 490 U.S. at 396). This analysis must account for the fact that police officers are often involved "in circumstances that are tense, uncertain, and rapidly evolving," during which time they are forced to make on-the-spot decisions about the amount of force necessary in any given situation. *See Graham*, 490 U.S. at 396-97. Ultimately, the question is whether the officers' actions were objectively reasonable in light of the totality of the circumstances, and without regard to the officer's intent or motivation. *See Estate of Phillips*, 123 F.3d at 592 (citing *Graham*, 490 U.S. at 397).

That force was used against Stewart is not disputed: all parties agree that Stewart was subjected to a takedown by Officer Larson. Furthermore, the undisputed facts show not only that Stewart was uncooperative, but also that he moved in close to Larson and had repeatedly threatened him with violence. In this situation, the court concludes that a takedown may well have been an objectively reasonable response to what may have appeared to Larson to be an escalating situation. *See Estate of Phillips*, 123 F.3d at 593 ("Authorities must be allowed 'to graduate their response to the demands of any particular situation.'" (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 542 (1985)).)

The reasonableness of a particular seizure, however, also depends on how it is carried out. *See Graham*, 490 U.S. at 395. The parties dispute the manner in which the takedown was carried out. Therefore, although a takedown may have been objectively reasonable if

16

carried out in the manner suggested by Larson, Stewart disputes Larson's account of the incident. Plaintiff testified that in the process of taking him down, Larson punched Stewart in the chest, attempted to slam his head against the counter, and stomped on his upper back. Larson denies all these actions, claiming instead that not only did he attempt to protect Stewart during the take down by placing his hand behind Plaintiff's head, but that because Stewart was the aggressor, Larson's response was merely an attempt to defend himself against the perceived threat of a lunge in his direction and Stewart's attempts at kicking him.

Despite this factual dispute, the Joliet Defendants cite a number of cases, relying most heavily on *Cox v. North Towne Mall*, No. 95 C 50283, 1997 WL 760505, at *6 (N.D. Ill. Dec. 8, 1997), for the proposition that it is objectively reasonable for a police officer to use some force against a threatening, uncooperative, or resisting arrestee. (Joliet Defs.' Br., at 20-21.) In *Cox*, two off-duty police officers working security at a mall escorted a handcuffed arrestee to a storage room to be searched. When the arrestee refused to sit in a chair as directed, one of the officers hit him in the stomach, "knocking the wind out of [him]." *Id.* at *4. The defendant police officers moved for summary judgment. Determining that the plaintiff had not properly stated an excessive force claim, and without deciding the issue, the *Cox* court nevertheless noted that "[w]hile there may have been a variety of ways in which [the officer] could have gained plaintiff's compliance, it cannot be said that the manner he chose was unreasonable under the circumstances. A person having the wind knocked out of him under these circumstances does not evidence excessiveness." *Id.* at *6 n. 6.

*Cox* is distinguishable from the present situation. First, although the court suggested

that the officer was entitled to summary judgment on an excessive force claim, it ultimately did not decide the issue. *See id.* Further, the *Cox* court appeared impressed by the lack of injury sustained by the plaintiff. Under a totality of the circumstances approach, the lack of an injury may indeed militate against a finding of excessive force. Excessive force claims do not require physical injury, however. *See Lester v. City of Chicago*, 830 F.2d 706, 712 (7th Cir. 1987). That Stewart lacked any physical injury as a result of the takedown should factor into the reasonableness calculus, but only when all the facts are undisputed. The facts presented in *Cox* do not appear to present the same sort of credibility determination that is required here. The *Cox* court makes no mention of whether the officer disputed hitting the plaintiff in the stomach. Here, not only does Larson dispute punching and stomping on Plaintiff, he maintains that he performed the takedown in a manner to minimize any potential physical harm. The court here is thus left with a factual dispute pitting the credibility of one party against the other. In an excessive force claim the Seventh Circuit has indicated that a "credibility dispute presented by . . . divergent accounts cannot . . . be decided on summary judgment." *See Dorsey v. St. Joseph County Jail Officials*, 98 F.3d 1527, 1529-30 (7th Cir. 1996); *see also Wilson v. Williams*, 997 F.2d 348, 350 (7th Cir. 1993) (reversing summary judgment in excessive force claim where district court made improper credibility determinations). Viewing the facts in the light most favorable to Stewart, the court concludes it cannot decide whether Larson's actions were objectively reasonable.

The Joliet Defendants also raise the defense of qualified immunity to the excessive force claim. Qualified immunity attaches to protect law enforcement officers from Section

1983 liability "'if either the federal law [they are] asserted to have breached was not clearly established at the time of the alleged violation or there exists no dispute of material fact which would prevent a finding that [the officer's] actions, with respect to following such clearly established law, were objectively reasonable.'" *See Wollin v. Gondert*, 192 F.3d 616, 622 (7th Cir. 1999) (citing *Tangwall v. Stuckey*, 135 F.3d 510, 515 (7th Cir. 1998)). Given the existence of disputed material facts, granting summary judgment on the basis of qualified immunity is not proper. *See Meyer v. Robinson*, 992 F.2d 734, 737 (7th Cir. 1993) ("if parties were disputing who did what, when, any questions of qualified immunity would have to wait until those fact issues were resolved"). Accordingly, the Joliet Defendants' motion for summary judgment on Count I against Larson is denied.

### 2. Against Harrah's

Count I of Stewart's complaint also seeks recovery from Harrah's for the alleged excessive force violation committed by Larson. To prevail on a Section 1983 claim, Stewart must prove that he was deprived of a federal right by a person acting under the color of state law. *See Pickrel v. City of Springfield*, 45 F.3d 1115, 1118 (7th Cir. 1985). Therefore, private conduct that is not fairly attributable to the state is not actionable under Section 1983, however discriminatory or wrongful the conduct may be. *See Sparkman v. McFarlin*, 601 F.2d 261, 270 (7th Cir. 1979). The Harrah's Defendants move for summary judgment on this claim arguing that as a private entity, Harrah's did not act under color of state law.

As Stewart does not allege any direct action by Harrah's that purportedly violated his civil rights, he presumably predicates the casino's liability on the theory of respondeat

superior. A private employer, however, cannot be held vicariously liable for Section 1983 violations of an employee, *see e.g., Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982); *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), even if that employee is an off-duty police officer, *see e.g., Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Draeger v. Grand Central, Inc.*, 504 F.2d 142, 146 (10th Cir. 1974). As such, the determination of whether a private entity acted under color of state law is not governed by traditional agency principles, although the application of such principles may be relevant for determining whether the private entity and a state actor engaged in joint activity.

Even if Stewart had alleged that some act of Harrah's – e.g., Harrah's hiring or training practices – resulted in a violation of his civil rights under Section 1983, such allegation would fail as a matter of law. For purposes of Section 1983 liability, a private entity is deemed to be acting under color of law only when it "is a willful participant in joint action with the State or its agents." *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980). To succeed under a "joint action" theory, a plaintiff must establish the existence of a conspiracy, or an agreement on a joint course of action in which the private party and the state have a common goal. *See Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 435 (7th Cir. 1986), *cert. denied*, 481 U.S. 1028 (1987) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). In order to establish the existence of a conspiracy, a plaintiff must show that the state actor and the private entity "reached an understanding" to deprive him of his constitutional rights. *See Moore v.*

*Markeplace Restaurant, Inc.*, 754 F.2d 1336, 1352 (7th Cir. 1985).

In cases involving private entities open to the public, courts have held that a conspiracy can be shown by evidence of a customary arrangement or pre-existing agreement between the entity and the police "under which the police simply carry out the [private entity's] directions." *See, e.g., Gramenos*, 797 F.2d at 435. More specifically, in situations involving private security guards who detain individuals, joint activity with the state occurs when the police allow the security guard's judgment about whether probable cause exists to be substituted for their own. *See Gramenos*, 797 F.2d at 435-36; *Lusby v. T.G.& Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984), *vacated in part on other grounds sub nom. City of Lawton v. Lusby*, 474 U.S. 805 (1985), *El Fundi v. DeRoche*, 625 F.2d 195, 196 (8th Cir. 1980); *Smith v. Brookshire Bros., Inc.*, 519 F.2d 93, 94 (5th Cir. 1975). If, pursuant to such an agreement, a police officer arrests an individual based solely on the security guard's designation and without independently determining if probable cause exists, not only would the arrest violate the Fourth Amendment, but the private party, in exercising the state's function, would be deemed to have acted under color of law. *See Herrera v. Chisox Corp.*, No. 93 C 4279, 1995 WL 599065, at *7 (N.D. Ill. Oct. 6, 1995).

The court pauses here to note Harrah's heavy reliance on *Gramenos* to support their argument that the casino and the Larson did not act jointly.[11] *Gramenos*, however, did not

---

[11]     Disappointingly, Stewart did not respond to the "joint action" argument at all, and instead only submits agency analysis to suggest that Harrah's is liable for Larson's actions. As such, Stewart did not challenge the application of *Gramenos* to the facts presented

(continued...)

involve facts identical to those presented here. In *Gramenos*, a grocery store security guard detained the plaintiff, accusing him of shoplifting. 797 F.2d at 432. The security guard called the police and held the plaintiff until they arrived. *See id.* Upon the arrival of the police, the security guard signed a criminal complaint against the plaintiff, and the police officers arrested him. *See id.* Affirming summary judgment in favor of the defendant grocery store on the plaintiff's Section 1983 action, the Seventh Circuit reasoned that the store was not a state actor, and that in the absence of evidence of a clandestine agreement between the police and the store, the store could not be liable under Section 1983 conspiracy theory. *See id.* 797 F.2d at 436.

Unlike the facts in *Gramenos*, the JPD had an agreement with Harrah's to provide assistance with security at the casino through the employment of off-duty officers. In other words, Harrah's employed uniformed off-duty Joliet police officers. At least one court has considered such circumstances sufficient to distinguish *Gramenos*. In *Groom v. Safeway, Inc.*, 973 F. Supp. 987, 991 (W.D. Wash. 1997), the plaintiff brought a Section 1983 action after an off-duty police officer working for the store as a security guard detained her on the belief that she was shoplifting. The off-duty officer was armed, in uniform, and paid by defendant Safeway. *See id.* at 989. In distinguishing the case from *Gramenos* and other similar cases, the *Groom* court concluded that Safeway and the Seattle Police Department engaged in joint action when the officer unreasonably detained the plaintiff. *See id.* at 991. The court

---

[11](...continued)
here.

reasoned that through the employment relationship, Safeway effectively "hired an instrument of the state's power." *See id.* The court stressed that the officer acted in his official capacity "on Safeway's time. . . . in Safeway's store and on Safeway's behalf; presumably he could not have wandered out of the store to patrol the surrounding neighborhood." *See id.* As such, the court concluded that the relationship involved an "overlapping identity and interest and sufficiently involve[d] the state in the relevant actions of the private entity to bring those actions under color of state law." *See id.*

The facts here differ from those of *Groom* in significant ways. Unlike the officer in *Groom*, Larson was not individually hired by the casino. Instead, the JPD contracted with Harrah's, as they have done with many private entities in Joliet, to provide special assignment officers when available. Further, Larson was paid for his time at Harrah's by the JPD, rather than by Harrah's. (Harrah's Defs.' Statement of Facts ¶ 91.) The present situation is less like that presented in *Groom* when consideration is given to the fact that Larson was called to the scene along with, rather than in lieu of, Harrah's security personnel. In other words, Larson's presence at Harrah's was not to enforce Harrah's rules as a security guard, but rather to enforce the law. As in *Gramenos*, when the Harrah's security guards determined that Stewart should be taken into custody, they requested police assistance; through the arrangement with Harrah's, however, Larson was present at the scene. Also unlike the officer in *Groom*, because Larson was working for the JPD rather than for Harrah's directly, he could be called away at any time to attend to other police matters. (*Id.* ¶ 90.) The court therefore concludes that the joint action test articulated in *Gramenos* is applicable to the facts

presented here.

Applying the *Gramenos* analysis, the court determines that Harrah's was not a state actor for Section 1983 purposes. On the night of Stewart's arrest, Larson worked a special off-duty assignment at Harrah's pursuant to a verbal agreement between Harrah's security manager, Ed Cisowski, and Captain William Fitzgerald of the Joliet Police Department. (Harrah's Defs.' Statement of Facts ¶¶ 4, 79.) Special assignment officers were asked to handle traffic control and, through police presence, to deter disturbances in the casino. (*Id.* ¶ 80.) Despite being considered "off-duty," special assignment officers are paid by the JPD. (*Id.* ¶ 91.) Pursuant to the oral agreement, however, Harrah's pays the JPD for any special assignment services it receives. (*Id.*) As previously mentioned, Larson wore the JPD uniform, maintained radio contact with the police department dispatcher, and could potentially be called away from a special assignment to attend other police matters. (*Id.* ¶ 90.)

Although neither party elicited specific deposition testimony regarding the existence of an agreement, plan, or scheme that the JPD would arrest whomever the Harrah's security personnel designated, certain testimony belies the existence of such an agreement. For example, Fitzgerald testified that the police department maintained "complete control and authority over the officers that work [at Harrah's]." (Fitzgerald Dep., at 19.) In other words, although Harrah's can suggest or request that special assignment officers perform certain functions – e.g., that special assignment officers take detained individuals to the dispatch room for processing, or that they wear Harrah's radios, or that they report to the security supervisor upon arrival at the casino – Harrah's has no authority to order or direct the

24

officers. (*Id.* at 19-20.) Indeed, Fitzgerald testified that special assignment officers are not bound by Harrah's dictates, personnel review, rules and regulations; instead, they are "bound by the rules and regulations of the City of Joliet and the Joliet Police Department." (*Id.* at 26.) Cisowski corroborated this testimony, stating that the special assignment officers are not required to enforce the casino's rules and regulations. (Cisowski Dep., at 28.) Indeed, Cisowski testified that the JPD did not always have the capability to fulfill his requests for special assignment officers. (*Id.* at 13.) Significantly, Larson testified that on certain occasions he denied Harrah's requests to arrest and charge patrons when he believed that probable cause to support the arrest did not exist. (Larson Dep., at 51.) Stewart, who bears the burden of proof on this issue, has offered no evidence tending to show the existence of an agreement between Harrah's and the JPD requiring the JPD to act at the unilateral direction of Harrah's.

With respect to the specific arrest at issue here, although Larson admits that Bragdon requested that Stewart be taken into custody and stated that he would sign a complaint for disorderly conduct (Larson Dep., at 75), it is apparent that the decision to effect the arrest was based upon Larson's own conclusion that probable cause for an arrest existed. Larson observed firsthand Stewart's language, behavior, and apparent intoxication. (*Id.* at 75, 79.) Moreover, although he knew that Harrah's preferred that detained patrons be taken to the dispatch office to complete Harrah's paperwork, Larson made the independent decision to take Stewart there to wait for transport to the Joliet police station. (*Id.* at 97.) Specifically, Larson stated that he made that decision based on his concerns about leading Stewart through

crowded public areas to his squad car. (*Id.*) Finally, Larson testified that he uses the same procedures for making arrests whether on special assignment or on regular duty, and that he likewise advises private citizens when he believes that probable cause for arrest does not exist. (*Id.* at 152-53.)

Again, Stewart has not pointed to any contradictory evidence. Therefore, no issue of material fact exists with respect to the existence of an agreement between the JPD and Harrah's to make arrests based solely upon the request of Harrah's security guards. Accordingly, the Harrah's Defendants' motion for summary judgment on this count is granted.

### C.   Counts II & V: Section 1983 Illegal Arrest And Malicious Prosecution

In Count II of his complaint, Stewart alleges that Larson and Harrah's violated his civil rights by falsely, and without probable cause, arresting and charging him with aggravated battery to a police officer. (Compl. ¶¶ 24-25.) He further alleges that Larson and Harrah's then maliciously caused the prosecution of this charge by filing false incident reports and by testifying falsely before the grand jury. (Compl. ¶ 33.) As a result, Stewart alleges that he was "incarcerated and denied his liberty, was injured, and sustained pain, suffering, mental anguish, [and] humiliation[.]" (Compl. ¶ 35.) In Count V, Stewart brings a second Section 1983 malicious prosecution claim making similar allegations against Harrah's, Bragdon, and Bulliner. (Compl. ¶¶ 56-64.) Specifically, Stewart alleges that he was incarcerated and denied his liberty as a result of the filing of allegedly false reports with the Will County State's Attorney. (Compl. ¶¶ 57-59.) Larson moves for summary judgment on the ground that

probable cause to arrest is an absolute bar to Section 1983 false arrest and malicious prosecution claims. The Harrah's Defendants move for summary judgment on the ground that Bulliner and Bragdon are not state actors, and that Harrah's cannot be vicariously liable for Larson's actions.

The existence of probable cause for arrest defeats a claim for unlawful arrest or malicious prosecution. *See Biddle v . Martin*, 992 F.2d 673, 678 (7th Cir. 1993). A police officer has probable cause to arrest an individual where the facts and circumstances within his knowledge are sufficient to warrant a belief that the suspect has committed or is committing an offense. *See Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). In Section 1983 actions for false arrest, probable cause need not have existed for the crime charged, so long as probable cause existed to arrest a suspect on a closely related charge. *See id.* at 647-48. The Seventh Circuit has reasoned that the "officer's view of the legal basis for the arrest" is not determinative of the propriety of an arrest. *See Richardson v. Bonds*, 860 F.2d 1427, 1430 (7th Cir. 1988).

Here, Stewart does not challenge his arrest for disorderly conduct nor his arrest for resisting a peace officer, both misdemeanors under Illinois law.[12] *See* 720 ILCS 5/31-1, 5/26-1. Instead, he argues only that he was falsely charged with aggravated battery to a peace officer, a Class 3 felony which carries no statutory bail amount. See 720 ILCS 5/12-4(b)(b). As a

---

[12]    Because Plaintiff does not challenge these charges, and because, as misdemeanors, they are not closely related to the felony aggravated battery of a peace officer charge so as to justify the arrest, the court does not decide whether probable cause existed for arrest on these two charges.

result, Plaintiff alleges he was unlawfully deprived of his liberty because he had to wait in jail overnight until a judge had the opportunity to review his case and set bail.

Because there remains an material dispute of fact as to whether Stewart kicked Larson while Larson attempted to effect the arrest, the court cannot decide on a motion for summary judgment whether probable cause to arrest for aggravated battery existed at the time.[13] The Joliet Defendants argue, however, that Larson had probable cause to arrest Stewart for the related felonies of intimidation and aggravated intimidation. "A person commits intimidation when, with intent to cause another to perform or to omit the performance of any act, he communicates to another, . . . a threat to . . . [i]nflict physical harm on the person threatened or any other person or on property." 720 ILCS 5/12-6(a)(1). Given the facts known to him at the time – e.g., that Stewart had threatened Harrah's personnel with physical violence if they did not return his coat to him – Larson could have reasonably believed that Stewart had committed the offense of intimidation.

The court also concludes that the offense of intimidation and aggravated battery are sufficiently closely related as to bar Stewart's malicious prosecution and false arrest claims.

---

[13]     "In committing a battery, a person commits aggravated battery if he or she . . . [k]nows the individual harmed to be a peace officer, . . . engaged in the execution of any official duties including arrest[.]" 720 ILCS 5/12-4(b)(6). "A person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a).   The court assumes the aggravated battery charged is based on the alleged kick.  Although Stewart may have sprayed spittle in Larson's face as he was yelling, Larson denies that Stewart intentionally spit phlegm at him, and therefore that incident does not meet the intent element of a battery offense.  (Larson Dep., at 92-93.)

Both offenses are Class 3 felonies, and are therefore not subject to the bail schedules set forth in Illinois Supreme Court Rule 528. As such, if Stewart had been arrested and charged with intimidation rather than aggravated battery, he would still have been required to spend the night in jail until he had the opportunity to appear before a judge. Section 1983 claims for malicious prosecution require not only a showing that the prosecution was groundless, but also that the plaintiff suffered some injury. *Cervantes v. Jones*, 188 F.3d 805, 809 (7th Cir. 1999), *cert. denied*, ___ U.S. ___, 120 S. Ct. 1159 (2000). The alleged injury here, deprivation of liberty, would have occurred if Stewart had been charged with intimidation, an offense for which there was probable cause to arrest. Because Larson could have reasonably believed there was probable cause to arrest for intimidation, a sufficiently related offense to aggravated battery under Illinois law, Stewart's illegal arrest and malicious prosecution claims are barred. Because probable cause is an absolute bar against Section 1983 malicious prosecution claims, Count II against Harrah's and Count V against Bragdon and Bulliner likewise cannot stand, and the court need not discuss whether these Defendants were state actors. Accordingly, the court grants summary judgment in favor Larson, Harrah's, Bragdon, and Bulliner on Counts II and V.

### D. Count III: Section 1983 Conspiracy

In Count III of his complaint, Stewart alleges that Harrah's Bragdon, Andrews, and Bulliner violated his civil rights under Section 1983 by conspiring with Larson to use excessive force and to secure an illegal arrest based on their filing of false incident reports. (Compl ¶ 37.) Stewart does not designate Larson as a party to Count III, nor does he seek

specific relief from Larson in this count. The Harrah's Defendants move for summary judgment on this count, arguing that they are not state actors, and therefore are not liable under Section 1983. The Harrah's Defendants further argue that Stewart has not presented any evidence of a conspiracy between the Harrah's Defendants and Larson.

As already discussed, a private party may fall within the ambit of Section 1983 when he is a willing participant in a joint action with the state or the state's agent. *See Dennis v. Sparks*, 449 U.S. 24, 27 (1980). Joint action may be established through proof a an actual conspiracy, or an agreement on a joint course of action in which the private party and the state have a common goal. *See Gramenos*, 797 F.2d at 435 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)). Establishing Section 1983 conspiracy liability on the part of private parties requires a showing that "(1) the private individual and a state official reached an understanding to deprive the plaintiff of her constitutional rights and (2) the private individual was a willful participant in joint activity with the state or its agents." *See Hanania v. Loren-Maltese*, 212 F.3d 353, 356 (7th Cir. 2000).

Stewart alleges that the Harrah's Defendants prepared misleading incident reports in an effort to cover up facts surrounding a violation of his constitutional rights. Specifically, to the exclusion of Andrews and Bulliner, Plaintiff argues only that Bragdon wrote his report in order to falsely corroborate Larson's claim that Stewart struggled with and kicked him. Stewart points specifically to the temporal relationship between the filing of Bragdon's and Larson's reports, arguing that the fact that Bragdon wrote his report after looking at Larson's report is evidence of a conspiracy. This argument fails as a matter of law. The court has

already determined that probable cause existed to arrest Stewart on a charge closely related to aggravated battery of a peace officer, and therefore no constitutional violation of false arrest or malicious prosecution occurred. There can be no constitutional violation "'in conspiring to cover-up an action which does not itself violate the Constitution.'" *See Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000) (quoting *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996)). Therefore, because the court has already determined that Defendants committed no substantive constitutional violations in arresting and charging Stewart with aggravated battery of a peace officer, the conspiracy claim on this conduct also falters.

Stewart, however, also alleges a conspiracy to use excessive force against him by kicking and stepping on Stewart and by taking Stewart "to a private room where he could be beaten rather than transferring him to the Joliet Police Station for processing." (Compl. ¶ 40.) First, no one disputes that Harrah's security personnel customarily escorted arrestees to the dispatch office in order to complete Harrah's paperwork on the incident and to call for squad cars. Larson further testified that although he knew of this practice, he nevertheless independently decided to take Stewart there instead of to his squad car to avoid further safety or possible flight issues. (Larson Dep., at 97.) Stewart offers nothing to dispute this testimony, and therefore has not shown the existence of an understanding between the security guards and Larson to take him to the dispatch room in order to "beat" him.

In his response brief to the Harrah's Defendants' motion for summary judgment, Stewart argues that Bragdon and Bulliner filed false incident reports to cover up the unreasonable force used against him by Larson. Specifically, Stewart's argument relies on

31

what he characterizes as a glaring inconsistency: that although Bragdon and Bulliner both testified that no physical contact took place between Stewart and Larson before the takedown, Bragdon reported that Stewart "struggled" with Larson before the takedown and Bulliner reported that Stewart became "unruly" thereby prompting the takedown. The court disagrees with Stewart's characterization of this evidence as contradictory. Neither the word "struggle" nor "unruly" necessarily implies physical contact. Indeed, the undisputed facts indicate not only that Stewart was belligerent and threatening, but that Larson perceived that Stewart was beginning to lunge at him. This conduct could fairly be described as a "struggle" or as "unruly" behavior. Stewart himself did not elicit an explanation of these terms from Bragdon and Bulliner to show otherwise. Further, that Andrews and Bulliner pinned Stewart's legs after the takedown likewise does not establish the existence of a conspiracy between these guards and Larson to engage in physical contact with Stewart before the take down actually took place. Indeed, in response to the question whether Larson gave any advanced warning of the takedown, Andrews testified that he did not. (Andrews Dep., at 100.) The court concludes that Stewart has not produced any evidence tending to show that the security guards and Larson "reached an understanding" to use excessive force against him. Accordingly, the Harrah's Defendants' motion for summary on Count III is granted.

### E.     Count IV: Section 1986 Action for Neglect to Prevent Against Bragdon, Andrews, and Bulliner

Stewart alleges in Count IV of his complaint that Bragdon, Andrews and Bulliner knew about both the use of excessive force and false arrest and charges against Stewart, but

neglected their duty to prevent either one from happening. Section 1986 provides a cause of action against "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do[.]" 42 U.S.C. § 1986. A Section 1986 claim for neglect to prevent a known conspiracy does not exist, however, in the absence of a conspiracy under Section 1985. *See Bell v. City of Milwaukee*, 746 F.2d 1205, 1258 n.67 (7th Cir. 1984) ("Section 1986 is a companion section to Section 1985, predicated upon the finding of a Section 1985 conspiracy, and not a distinct cause of action."). In other words, "[a] finding of a Section 1985 conspiracy is a necessary prerequisite to a finding of liability under Section 1986." *See id.* at 1233 (citations omitted). To establish a claim for Section 1985 conspiracy, a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Roach v. City of Evansville*, 111 F.3d 544, 547 (7th Cir. 1997). To recover under Section 1985(3),[14] a plaintiff must establish that the conspiracy was motivated by racial or other class-based animus, *see id.*

---

[14]     Because Stewart never specifically alleges a Section 1985 action, the court assumes that his Section 1986 claim is predicated under a Section 1985(3) conspiracy to deprive persons of rights or privileges, rather than a Section 1985(1) conspiracy to prevent federal officers from performing duties claim or a Section 1985(2) conspiracy to obstruct justice, or to intimidate a party, witness or juror. *See* 42 U.S.C. § 1985(1)-(3).

(citation omitted), although the invidious discrimination need not be the sole reason for the conspirators' acts, *see Bell*, 746 F.2d at 1258 (citation omitted).

Nowhere in his complaint does Stewart allege a Section 1985 equal protection conspiracy. Nevertheless, he argues that his Section 1986 claim survives because he has already established conspiracies to falsely arrest and prosecution him and to use excessive force against him. Stewart relies on the same facts and arguments proffered to support his claims for malicious prosecution and a Section 1983 conspiracy, primarily the fact that Bragdon prepared his report after reviewing Larson's report. Without even addressing the racial animus question, the court has already determined that Stewart has not established the commission of overt acts to support a finding of either a conspiracy to maliciously prosecute or of a conspiracy to use excessive force against him. Stewart offers no other evidence of a conspiracy in support of his Section 1986 claim. Without proof of a Section 1985 conspiracy, or at least a material issue of fact regarding the existence of a Section 1985 conspiracy, Stewart's Section 1986 claim cannot withstand summary judgment. *See Bell*, 746 F.2d at 1258 n.67. The Harrah's Defendants' motion for summary judgment on Count IV is granted.

### F.     Count VI: Section 1981 Racial Discrimination Against Larson

In Count VI, Stewart pursues a claim of racial discrimination under 42 U.S.C. § 1981 based on his assertion that Larson, on one occasion, referred to him as a "nigger" after the takedown. The Joliet Defendants move for summary judgment on this claim, arguing that Section 1981 does not contemplate a cause of action for injuries of the type alleged by Stewart.

34

Section 1981 protects against discrimination on the basis of race or alienage and is established when a plaintiff shows (1) he is a member of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; (3) the discrimination involved one of the activities enumerated in the statute. *See Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996). The rights enumerated in the statute include the rights "to make and enforce contracts, to sue, be parties, give evidence and to the full and equal benefit of all laws and proceedings for the security of persons and property . . . and [to] be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind[.]" 42 U.S.C. § 1981. Although Section 1981 is most often invoked in the contract formation setting, *see Bell*, 746 F.2d 1205, 1232 (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)), some courts have held that the "equal benefits" and "like punishments" language extends to encompass racially motivated arrests, beatings, and searches made in the absence of probable cause. *See e.g., Mahone v. Waddle*, 564 F.2d 1018, 1028 (3d Cir. 1977); *Mendez v. Rutherford*, 687 F.Supp. 412, 416 (N.D. Ill. 1988). Even the Seventh Circuit in *Bell* suggested that "'[r]acially motivated disuse of governmental power' falls within the ambit of the language of Section 1981 where one of the enunciated rights is denied." *See Bell*, 746 F.2d 1205, 1232 (quoting *Hall v. Pennsylvania State Police*, 570 F.2d 86, 91 (3d Cir. 1978)).[15]

---

[15]    In a more recent opinion, *Irvin v. Kaczmaryn*, 913 F.Supp. 1190, 1201 (N.D. Ill. 1996), a court in this district questioned the validity of *Bell's* expansive reading of Section 1981 in light of the Supreme Court's ruling in *Patterson v. McLean Credit Union*, 491 U.S. 164, 176 (1989). In *Patterson*, the court wrote "[w]here an alleged act of discrimination does not involve the impairment of one of these specific [contract] rights, §1981 provides no
(continued...)

The court need not decide this issue affirmatively here,[16] however, because the court

---

[15](...continued)

relief." 491 U.S. at 176. Confronted with the issue of whether Section 1981 extends to racially-motivated searches and seizures, the *Irvin* court opined, without deciding, that this statement in *Patterson* may have undermined the vitality of *Bell's* more expansive approach to Section 1981. *See Irvin*, 913 F.Supp. at 1201. This court does not share the *Irvin* court's concern. *Patterson* involved a former employee who brought a Section 1981 suit claiming that her former employer failed to promote her and discharged her because of her race. The Supreme Court was therefore confronted with the issue of whether, under the relevant contract provisions of Section 1981, the provision applied to conduct beyond the "making and enforcing" of contracts. *See Patterson*, 491 U.S. at 176 ("Section 1981 cannot be construed as a general proscription of racial discrimination in all aspects of contract relations, for it expressly prohibits discrimination only in the making and enforcement of contracts. . . .By its plain terms, the *relevant provision* in § 1981 protects two rights: 'the same right . . . to make . . . contracts' and 'the same right . . . to . . . enforce contracts.'") (citations omitted) (emphasis added). The Court held that the right to make and enforce contracts protected by Section 1981 does not extend to protect employees from racial harassment suffered during the course of employment. *See id.* In so concluding, the Court did not purport to determine the scope of the other rights enumerated in Section 1981. Indeed, in a subsequent decision, the Seventh Circuit explained such an understanding of *Patterson*, emphasizing that Section 1981 is not concerned exclusively with employment contracts. *See Palmer v. Board of Educ. of Community Unit Sch. Dist. 201-U*, 46 F.3d 682, 686-87 (7th Cir. 1995). The court further notes that the Civil Rights Act of 1991 overruled *Patterson's* narrow reading of Section 1981 by adding a broad definition of the "to make and enforce contracts" clause to the statute. *See* 42 U.S.C. § 1981(b).

[16]     The court notes, however, that recently the Seventh Circuit affirmed the entry of a directed verdict in favor of a defendant sued under Section 1981 based on racially-motivated arrest. *See Glass v. Village of Sauk*, 81 F.3d 163, (Table, Text in WESTLAW) No. 94-2782, 1996 WL 149342, at *2 (7th Cir. Mar. 28, 1996). Without even discussing whether Section 1981 claims reach racially-motivated arrests, the *Glass* court affirmed the directed verdict on the Section 1981 claim on the ground that plaintiff did not establish racial animus. *See id.* The court's silence on the issue arguably implies that Section 1981 does encompass racially motivated arrests. Further, in a case involving a voting rights claim brought pursuant to Section 1981, the Seventh Circuit cited *Mahone v. Waddle*, 564 F.2d 1018 (3d Cir. 1977) as support for the proposition that Section 1981 ensures the exaction of equal "punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." *See Palmer v.*
(continued...)

has already determined that Larson had probable cause to arrest Stewart. Section 1981 claims are subject to the same methods of proof as Title VII race-discrimination claims. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 940 (7th Cir. 1996). A legitimate business reason for an adverse employment action, if not shown to be a pretext for discrimination, precludes recovery under Title VII. Under the same rationale, probable cause for an arrest and subsequent indictment arguably precludes recovery on a Section 1981 racially-motivated arrest claim. *See Mahone*, 564 F.2d at 1028 (allegations that plaintiffs were arrested without probable cause and convicted by false testimony because of their race state claim under Section 1981); *Mendez*, 687 F.Supp. at 416 (racially-motivated arrests, beatings and searches *made in the absence of probable cause* fall within protection of Section 1981). Assuming Stewart can assert a Section 1981 claim based on these facts, in the presence of probable cause, he cannot prevail on his claims of racially-motivated arrest or prosecution.[17]

Stewart's Section 1981 claim also fails on the element of discriminatory intent. In proving a Section 1981 claim, a plaintiff may present either direct evidence of discrimination

---

[16](...continued)
*Board of Educ. of Community Unit Sch. Dist. 201-U*, 46 F.3d 682, 687 (7th Cir. 1995). Without explicitly approving of or adopting the holding as applied to the facts presented in *Mahone*, the Seventh Circuit nevertheless agreed with *Mahone* that Section 1981 "was designed to remove obstacles to the full participation of blacks in the legal system." *See id.*

[17]    The language in *Mendez* was not meant to suggest that a racially motivated beating in the presence of probable cause would not violate Section 1981. *See Quinn v. Cain*, 714 F. Supp. 938, 943 n.5 (N.D. Ill. 1989). As discussed *infra*, however, Stewart is unable to establish the discriminatory intent element of his Section 1981 claim, even as it relates to a racially-motivated beating.

or may instead proceed on the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1116 (7th Cir. 1993). Stewart's only evidence of discriminatory intent consists of his testimony that Larson used a derogatory racial epithet on a single occasion during the search incident to arrest. Acknowledging *Bell*'s holding that racial slurs may support a finding of racial animus, 746 F.2d at 1259, Stewart has done nothing to show the court how he would be able prove discriminatory intent. Even construing the evidence in the light most favorable to Stewart, it is insufficient to meet Stewart's burden under the direct method.

Applying Title VII law, the proffered direct evidence must not only be relevant to the issue of discriminatory intent, it must also relate to the specific challenged decision. *See Cowan v. Glenbrook Security Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). In other words, stray remarks not related to the action in question are insufficient to demonstrate that the defendant was motivated to act by the plaintiff's race. *See id.* at 444 (citing *Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989)). Although Larson's alleged statement, "nigger, I don't want to put my hands on you," before conducting the search incident to arrest is undoubtedly offensive, it is insufficient to show that race motivated Stewart's arrest or the charges brought against him. The record clearly reflects the existence of probable cause to arrest and charge Stewart – the single remark, unrelated to those actions, does not establish that racial animus was the motivating factor for Larson's actions. *See Sampson v. Village Discount Outlet, Inc.*, 832 F. Supp. 1163, 1167 (N.D. Ill. 1993), *aff'd* 43 F.3d 1474 (7th Cir.1994) (summary judgment granted in favor of officer sued under Section 1981 for calling

plaintiff a "fucking Jew."); *Carson v. Armstrong World Indus., Inc.*, No. 98 CV 4205, 1999 WL 1267708, at *3 (N.D. Ill. Nov. 30, 1999) (supervisor's use of the word "nigger" is "highly offensive and inappropriate . . . but it does not, in itself, constitute an admission of discriminatory intent."); *Helton v. Dornan*, No. 97 C 0220, 1999 WL 58641, at *8-9 (N.D. Ill. Jan. 26, 1999) (despite evidence that police officer called plaintiff a "stupid nigger," during arrest, plaintiff failed to establish racial animus necessary for equal protection claim). Likewise, Stewart's claim would fail on under the indirect method of proof as he has offered no evidence that white arrestees are not arrested, charged, or beaten under similar circumstances. *See Cowan*, 123 F.3d at 445; *Helton*, 1999 WL 58641, at * 8-9 (granting summary judgment in favor of officers where plaintiff's equal protection claim is based solely on his allegation that arresting officers used racial epithets during his arrest, because plaintiff failed to show use of selective law enforcement procedures). Given the existence of probable cause and the lack of evidence of selective enforcement, Larson is granted summary judgment on Stewart's racially motivated arrest claim under Section 1981.

### G.    Count VII:  Battery Against Larson, Andrews & Bulliner

In Count VII, Stewart alleges claims of battery against Larson, Andrews, and Bulliner under Illinois common law.  Under Illinois law, a person commits an intentional battery when he willfully touches another person without the consent of the person touched. *See Gragg v. Calandra*, 297 Ill. App. 3d 639, 645, 696 N.E.2d 1282, 1286 (2d Dist. 1998).  A person may be liable for battery not only if the contact results in physical harm, but also for contact that is merely offensive or insulting. *See id.*  Each Defendant named in this Count moves for

summary judgment advancing self-defense arguments.

### 1.  Battery Claim Against Larson

Larson argues that the force he used in effecting Stewart's arrest was reasonable under Section 7/5 of the Illinois Criminal Code. Codifying the common law doctrine of the use of force as applicable to police officers, Section 7-5 of the Illinois Criminal Code provides:

> A peace officer, or any person whom he has summoned or directed to assist him, need not retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. He is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest.

720 ILCS 5/7-5(a). Although Section 7-5 is part of the state criminal code, it has been applied in cases where police officers are faced with civil liability for battery in effecting arrests. *See, e.g., LaMonte v. City of Belleville*, 41 Ill. App. 3d 697, 703-04, 355 N.E.2d 70, 76-77 (5th Dist. 1976) (measure of police officer's civil liability for use of deadly force is co-extensive with his criminal liability); *Elliott v. Spencer*, No. 92 C 20082, 1993 WL 114534, at *4-5 (N.D. Ill. Apr. 8, 1993)(Section 7-5 applies to a civil battery claim against a police officer arising out of the officer's use of non-deadly force in effecting arrest).

Applying Section 7-5, the court may find that a police officer is justified in using any force he reasonably believes is necessary to effect the arrest. Here, the court cannot make such a determination because there remains a material issue of fact about the force actually used by Officer Larson. As discussed previously, given Stewart's threats and movement towards Larson, it may have been reasonable for Larson to take Stewart down to the floor.

Stewart claims, however, that in the process of the takedown, Larson punched and stomped on his back. Larson denies these acts, and the video tape does not conclusively decide the matter. As such, construing the facts in the light most favorable to Stewart, the court is not in a position to decide as a matter of law that Larson was justified in punching and stomping on a handcuffed Stewart at the time of the takedown. Accordingly, Larson's motion for summary judgment on Count VII is denied.

### 2. Battery Claim Against Andrews & Bulliner

Stewart alleges that Andrews and Bulliner stepped on his legs after the takedown, thereby holding them down and leaving red marks. (Stewart Dep., at 244.) Both Andrews and Bulliner claim that they pinned Stewart's legs in response to Stewart's kicking them while struggling on the floor after the take down. Stewart, for his part, denies kicking Andrews and Bulliner, thereby rendering the physical contact unnecessary.

Illinois recognizes the doctrine of self-defense as a defense against a claim of civil battery. *See Thompson v. Petit*, 294 Ill. App. 3d 1029, 1035, 691 N.E.2d 860, 864 (1st Dist. 1998). To succeed on a self-defense claim, a defendant must establish that: " (1) force had been threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the force threatened against him was unlawful; (5) he had an actual belief that (a) a danger existed, (b) force was necessary to avert the danger, and (c) the amount of force used was necessary; and (6) his belief was reasonable." *Id.* (citations omitted). Because there remains an issue of material fact with respect to the first element of their affirmative defense, whether Stewart threatened them with force, the court cannot now decide as a matter of law that

Andrews and Bulliner acted in self-defense when they pinned Stewart's legs. Accordingly, Andrew's and Bulliner's motion for summary judgment on Count VII is denied.

### H.    Counts VIII - XI: Negligent Hiring, Failure to Train & Failure to Discipline Against Harrah's, The City of Joliet, & Joliet's Chief of Police

Pursuant to an agreement by the respective parties, the court bifurcated these four Counts pending resolution of the summary judgment motion on the other counts. Because the excessive force claim against Larson and the battery claims against Larson, Andrews, and Bulliner remain standing, the court cannot now grant summary judgment on these outstanding claims. Accordingly, the parties are instructed to complete discovery on Counts VIII through XI within 60 days.

### CONCLUSION

Both the Harrah's Defendants' and the Joliet Defendants' motions to strike (Docs. 99-1 and 103-1) are granted in part and denied in part, as discussed *supra*. The Joliet Defendants' motion for summary judgment (Doc. 72-1) is granted with respect to Counts II and VI, but denied with respect to Counts I and VII. The Harrah's Defendants' motion for summary judgment (78-1) is granted with respect to Counts I, II, III, IV and V and denied with respect to Count VII. In summary, the following Counts have survived summary judgment: Count I Excessive Force Against Larson and Count VII Battery Against Larson, Andrews, and Bulliner. Counts VIII and IX against Harrah's and Counts X and XI against the City of Joliet and the Joliet Chief of Police were not considered for purposes of the present motions for summary judgment. The parties are directed to complete discovery on those outstanding

Counts (VIII-XI) within 60 days.

ENTER:

Dated: July 17, 2000

REBECCA R. PALLMEYER
United States District Judge